*G. G. Bower,* contra.

---

# DOWNING LUMBER COMPANY *v.* MEDLIN & SUNDY.

1. An administrator can not sell, at private sale, land the title to which is in the estate he represents, except "wild uncultivated" land.

2. The evidence was not such as to require a finding that either of the tracts of land involved was not "wild uncultivated" land at the time the administrators, respectively, made private sales thereof under orders

granted by the court of ordinary; and the trial judge erred in directing a verdict for the defendants. (Atkinson, J., dissents.)

AUGUST 17, 1911.

Equitable petition. Before Judge Parker. Charlton superior court. April 11, 1910.

*Wilson, Bennett & Lambdin* and *Charles J. Haden,* for plaintiff.

HOLDEN, J. The plaintiff in error filed its petition to have the defendants in error enjoined from cutting and removing timber from two described tracts of land, and from using the timber for turpentine purposes, or otherwise interfering with it. The plaintiff claimed title under deeds from administrators whose intestates had grants, respectively, to the two tracts of land from the State. Upon the conclusion of the evidence the court directed a verdict in favor of the defendants, and the plaintiff excepted. The administrators who made the deeds each obtained an order from the ordinary appointing him, authorizing him to sell the tract of land of his intestate as wild land at public or private sale. The administrators, respectively, made private sales of the two tracts of land, and deeded the same to the plaintiff. The bill of exceptions recites that upon the conclusion of the evidence the court "directed a verdict for the defendants, in language following, namely: 'It appearing to the court that at the time the deeds were made to these lots of land Nos. five and six to the plaintiff in this suit, that the defendants were in possession of lots in controversy, 'and that thereupon these deeds being made by the administratrix of the estates of Melton and Rogers, the plaintiff can not recover in this suit, for the reason that, as stated in Code [1895] section 2457 [Code of 1910, § 4033], an administrator can not sell property held adversely to the estate by a third person; he must first recover possession. This having not been done by the administratrix aforesaid, a verdict is directed for the defendants. This verdict is directed solely and only upon this ground.'" The plaintiff excepted to the direction of a verdict, on the ground, among others, that the section of the code referred to, providing that an administrator can not sell lands held adversely to the estate, "is not applicable to a sale of wild lands." The plaintiff in error contends that the statute intended to give an administrator the right to sell wild land at private sale, though held at the time adversely to the estate. Under the common law, and under the statute of 32 Henry VIII,

a deed to lands at the time in the adverse possession of others was void. The act of 1858 (Acts 1858, p. 56) gave ordinaries the right to pass orders authorizing an administrator to sell, at private sale, "wild and scattered.lands lying and being in different counties in this State." This act is codified in the Civil Code (1910), § 4024, which is as follows: "On application by the administrator and due notice advertised as hereinafter provided in case of land, the ordinary may grant an order authorizing the administrator to sell, at private sale, wild uncultivated lands lying in counties other than that of the administration: Provided, no objection is filed by any one interested in the estate, and the ordinary is satisfied that such sale is preferable." In 1859 (Acts 1859, p. 24) an act was passed which is codified in the Civil Code (1910), § 4185, and which reads as follows: "A deed to lands, made while the same are held adversely to the maker of the deed, is not void." Civil Code (1910), § 4033, which is the same as section 3457 of the Code of 1895, referred to by the court when he directed a verdict, is as follows: "An administrator can not sell property held adversely to the estate by a third person; he must first recover possession." Cultivated land in the adverse possession of any one would not be wild land, and could not be sold as such under the Civil Code (1910), § 4024, above quoted. The provision of the Civil Code (1910), § 4033, that "an administrator can not sell property held adversely to the estate by a third person," is an exception to the general law in the Civil Code (1910), § 4185, providing that "A deed to lands, made while the same are held adversely to the maker of the deed, is not void," and the word "property" in the section first above quoted applies to sales of all kinds of property. Orders for the sale of wild lands must be granted upon written application therefor, after publication of notice in the same manner as in instances where orders for the sale of land other than wild land are granted; and an order for the sale of wild land may require it to be sold at public sale. It has been many times held that a public sale of land other than "wild land" by administrators, while in the adverse possession of others, and a deed in pursuance thereof, conveys no title. *Weitman* v. *Thiot,* 64 *Ga.* 11; *Coggins* v. *Griswold,* 64 *Ga.* 423; *Lowe* v. *Bivins,* 112 *Ga.* 341 (37 S. E. 374); *Hanesley* v. *Bagley,* 109 *Ga.* 346, 348 (34 S. E. 584); *Hall* v. *Armour,* 68 *Ga.* 449; *Heard* v. *Phillips,* 101 *Ga.*

691 (31 S. E. 216, 44 L. R. A. 369); *Davitte* v. *So. Ry. Co.,* 108 *Ga.* 665 (34 S. E. 327). The main reason that such sales are made void is that property, though actually belonging to the estate, would not likely bring its full value when held adversely to the estate, and the administrator could not give possession. Even if land in the adverse possession of any one can be said to be "wild land," the same reasons which would make unwise the sale of land other than wild land in the possession of another would apply to wild land in the adverse possession of another. However, we do not see how land in the adverse possession of any one can be said to be "wild land." It makes no difference whether the land be designated as "wild land," or by some other description; the fact that it is held adversely to the estate makes a sale of it by the administrator of the estate void. If the land is not "wild uncultivated land," under the statute the administrator has no right to sell it at private sale; nor would he have the right to sell it at public or private sale if it was "wild uncultivated land" and held adversely to the estate, even if land held adversely to the estate could in any case properly be denominated "wild land."

We do not think the evidence such as warranted the court in directing a verdict for the defendants on the ground on which he directed it. Under the evidence, the question as to whether the lands were "wild uncultivated lands" when the private sales and deeds by the administrators were made to the plaintiff was one for the jury. There were in evidence grants from the State to the two lots; one grant was to Zackariah Melton and the other to Davis Rogers, each conveying one of the lots of land. The deed of the administrator of Rogers to the plaintiff was dated July 6, 1906, and was made under an order of the ordinary granted at the July term, 1906, of the court of ordinary. The deed of the administrator of Melton to the plaintiff, conveying the other lot of land, was dated September 28, 1906, under an order of the ordinary granted at the September term, 1906, of the court of ordinary. There was in evidence a deed to the two lots of land from Sharpe to Lydia Stone, dated April 10, 1905, and a deed from the latter to the defendants, conveying the two lots of land, dated May 19, 1905. The only oral testimony upon the trial of the case was that of Gordon Stone, whose testimony in full was as follows: "I am acquainted with lots Nos. 5 and 6 in the 2nd district of Charlton

County. I know the defendants in this case. Medlin & Sundy [defendants] boxed and worked these lots for turpentine purposes. They boxed and worked them in 1906, and I believe they went right on until 1907. Either that, or they boxed them in 1905 and continued to work them until 1906. They worked these boxes until they were stopped from so doing by a bill of injunction. They worked the turpentine on these lots until they were stopped by an injunction. Medlin & Sundy cut the boxes and cornered them and chipped them and dipped them until they were stopped. This paper purporting to be a deed from Lydia A. Stone to Medlin & Sundy is the deed under which Medlin & Sundy claim these lots. I suppose that on the two lots Medlin & Sundy had cut six or eight thousand boxes. They did not box all of either lot, but boxed about one half of the timber on each lot, or rather between one third and one half of the timber. Most of the timber that they boxed was on the west side of the lot. This did not adjoin their other turpentine operations. It was about a mile from their other turpentine operations, which were over towards Mr. Mose Crew's. There were no swamps dividing the lots, but these lots lie in the Little Okefenokee Swamp. The reason why they did not box the other was because the swamp was too bad. Medlin & Sundy cut and worked about five or six thousand boxes. Lydia A. Stone, referred to in this deed, is my wife. Medlin & Sundy commenced boxing lots 5 and 6 in the 2nd district of Charlton county under this deed dated May 19, 1905, either in the year 1905 or 1906. I do not know definitely when they began their operation, as I was not interested in that business. They did not box the timber in 1906 though, for they worked it in 1906. They were not back-boxing timber, but were cutting round timber. Some of the timber had been boxed before this round timber that they boxed. I will not be positive as to the date as to when they commenced working these lots, but I am certain that they worked the turpentine in 1906. They cut something like six or eight thousand boxes on lot No. 5. I do not know how much on each they cut, but the two lots lay broadside of one another. There were two islands that they boxed. They boxed Gallberry Island, but the rest of the swamp was so bad that they could not get to work it. They boxed and worked about one third or one half of each lot. They just worked the new boxes in 1906 that they had already cut. It might

have been that they had some more boxes that they worked lower down, but I do not know about that. I do not know exactly when in 1906 they started to work the new boxes. I do know, however, that·they worked them in 1906. Replying to your question as to how continuously they worked them, I will say that they worked them regularly. They chipped them once a week, and dipped them regularly. This work was down around the swamp or bay or on the islands. I know the lines of these lots, for I helped Mr. Cooper run them out. Replying to your question as to how I know that they worked these boxes in 1906, I will say that I was not there when they commenced working them, but I was there during the season, and they worked them pretty regularly. I made several trips over there. The first time I went over there they were working them. They had the boxes cut when we ran the lines. I do not remember exactly when it was that we ran the lines, but Mr. Cooper can tell you the dates." This testimony was not such as to require a finding that the defendants boxed or worked the trees for turpentine purposes until the year 1906, in which the plaintiff obtained the deeds of the administrators. The defendants boxed the trees for turpentine purposes "in 1905 or 1906," and "worked" them for such purposes the year succeeding the one in which they boxed them. If they did not box the trees until 1906, as far as disclosed by the evidence such boxing may have been done in that year after the deeds of the administrators were made to the plaintiff. The private sales of the land by the administrators were void if they were not "wild uncultivated lands" at the time of the sale, as administrators have no right to sell at private sale any lands of the estate they represent, except "wild uncultivated lands." The lands would not be "wild uncultivated lands" if they were in the adverse possession of the defendants. If when the private sales of the administrators were made the lands were in the adverse possession of the defendants, the sales would be void, as the lands would not be "wild uncultivated lands." The land might not be in the adverse possession of the defendants, and yet not be "wild uncultivated lands." If the lands at the time of the sale were not in the adverse possession of the defendants, the sales would be void if they were not "wild uncultivated lands." As land in the adverse possession of any one can not be wild land, the only question involved is whether or not, under the evidence, the lands were

"wild uncultivated lands" at the time of the private sales by the administrators. This question was one for the jury, and the court. erred in directing a verdict for the defendants.

*Judgment reversed. All the Justices concur, except Beck, J., absent, and Atkinson, J., dissenting.*